1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MIGUEL CASTANEDA, KATHERINE
CORBETT, and JOSEPH WELLNER, on
behalf of themselves and others similarly
situated,

        Plaintiffs,

  v.

BURGER KING CORPORATION,

        Defendant.

———————————————————/

No. C 08-04262 WHA

**ORDER GRANTING CLASS
CERTIFICATION AS TO TEN
BURGER KING STORES
AND OTHERWISE DENYING
CLASS CERTIFICATION**

**INTRODUCTION**

      The normal class in an ADA action proceeds against a single store on behalf of all

disabled patrons using that store. The instant action seeks to proceed against approximately

92 different stores throughout California on behalf of a class of all mobility-impaired patrons

at all 92 locations. All of the stores are Burger King restaurants. Although the class claims

would share Burger King Corporation as a common target, the physical differences among the

92 locations would predominate over the common issues, there being no common blueprint

among them (or even among any subset of them). Whether or not any store was ever out of

ADA compliance would have to be determined store by store, feature by feature, before turning

to the easier question of whether defendant as the franchisor/lessor, would have a duty to force

the franchises to remediate. Therefore, such a large sprawling class will not be certified.

1    Instead, separate classes will be certified against each of the ten individual restaurants where a

2    named plaintiff encountered alleged access barriers.

3                                            **STATEMENT**

4        **1.    THE PARTIES.**

5            Defendant Burger King Corporation is a franchisor of restaurants selling hamburgers and

6    related fast-food products.  There are approximately 600 Burger King restaurants in California.

7    Approximately 92 of these are leased by Burger King Corporation to the franchisees, which

8    operate and maintain them.[1]  In some cases, Burger King Corporation itself leases the properties

9    from a third-party, then subleases them to the franchisees; in other cases, Burger King

10   Corporation owns the properties and leases directly to the franchisees (Campins Exh. 53, 78–85,

11   122).

12           Named plaintiffs, Miguel Castaneda, Katherine Corbett, and Joseph Wellner, are among

13   the more than 150,000 Californians who use wheelchairs or scooters for mobility.  They bring

14   this action to remedy alleged architectural barriers to access at restaurants that Burger King

15   Corporation leases to franchisees in California.  The putative class seeks an injunction ordering

16   defendant to adopt policies that would ensure access for customers who use wheelchairs and

17   scooters and to bring the leased restaurants into compliance with the Americans with Disabilities

18   Act, 42 U.S.C. 12101, Section 51 of the California Civil Code (the Unruh Civil Rights Act),

19   and Section 54 of the California Civil Code (the California Disabled Persons Act).  The putative

20   class also seeks the minimum statutory damages per offense under the Unruh Act and the CDPA.

21       **2.    THE ADA AND CALIFORNIA STATUTES.**

22           The ADA was enacted in 1990 "to provide a clear and comprehensive national mandate

23   for the elimination of discrimination against individuals with disabilities."  42 U.S.C.

24   12101(b)(1).  This important statute recognizes that "the Nation's proper goals regarding

25   individuals with disabilities are to assure equality of opportunity, full participation, independent

26   living, and economic self-sufficiency for such individuals."  42 U.S.C. 12101(a)(8).  Title III of

27   _____

28       [1] Ninety-six different corporate-leased Burger King restaurants existed in California during the class
period, although, not at the same time due to stores closing and opening.  There are currently 92 operational
stores in the purported class.

the ADA prohibits discrimination on the basis of disability in places of public accommodation, with respect to both the accessibility of their physical facilities and with respect to their policies and practices.

The ADA required the Department of Justice to issue regulations carrying out the non-transportation requirements of Title III. 42 U.S.C. 12186(b). Pursuant to this statutory mandate, the DOJ promulgated standards for accessible design, which were codified at 28 C.F.R. pt. 36, App. A. These regulations are "entitled to deference." *Bragdon v. Abbott*, 524 U.S. 624, 646 (1998). The DOJ standards contain detailed design specifications for public accommodations covering an exhaustive list of architectural elements including, among others, space allowance and reach ranges, accessible routes, parking lots and passenger loading zones, curbs, ramps, doors, ground and floor surfaces, food service lines, and restrooms. For example, the design specifications for ramps specify, among other requirements, their maximum slope and rise, their minimum clear width, the minimum dimensions for landings at ramps' tops and bottoms, and the requirements for handrails. Design specifications for bathrooms include detailed requirements for doors, toilet stalls, urinals, lavatory fixtures, mirrors, sinks, and more. Different design specifications apply depending on whether a bathroom is designed for a single user or has multiple stalls.

The accessibility requirements of Title III and the DOJ standards vary depending on the dates that facilities were constructed or altered. Facilities built after January 26, 1993, are required to be "readily accessible to and usable by" individuals who use wheelchairs, and must comply with the DOJ standards. 42 U.S.C. 12183(a)(3); 28 C.F.R. 36.406(a). When earlier-built facilities are altered in certain ways after January 26, 1992, the altered portion and to some extent the path of travel to the altered portion must comply with the DOJ standards. 28 C.F.R. 36.402(b)(2); 36.406(a). In facilities built prior to January 26, 1993, and not altered since January 26, 1992, architectural barriers must be removed where it is "readily achievable" to do so. 42 U.S.C. 12182(b)(2)(A)(iv). The determination of what is "readily achievable" turns primarily on the nature and cost of the barrier removal and the resources of the public accommodation involved, including "the overall financial resources of any parent corporation or

3

entity." 28 C.F.R. 36.104; 42 U.S.C. 12181(9). In addition, facilities must "maintain in operable working condition those features of facilities and equipment that are required to be readily accessible to and usable by persons with disabilities." 28 C.F.R. 36.211.

Turning to the California statutes, both the CDPA which was enacted in 1968, and the Unruh Act which was amended in 1987 to cover persons with disabilities, prohibit discrimination on the basis of disability in the full and equal access to the services, facilities and advantages of public accommodations. Cal. Civ. Code §§ 51(b), 54.1(a)(1). A prevailing plaintiff is entitled among other relief to statutory minimum damages regardless of whether the plaintiff has suffered any actual damages. *Botosan v. Paul McNally Realty*, 216 F.3d 827, 835 (9th Cir. 2000) (holding that "proof of actual damages is not a prerequisite to recovery of statutory minimum damages" under the Unruh Act and the CDPA). The putative class seeks the statutory minimum damages for each offense. This includes $4,000 for each violation of the Unruh Act and $1,000 for each violation of the CDPA. Plaintiffs can be expected to seek damages on the basis that a violation occurs each time a patron visits a store and encounters an access barrier there. Plaintiffs assert that the amount in controversy here exceeds five million dollars (Compl. ¶ 6).

All buildings constructed or altered after July 1, 1970, must comply with state standards governing the physical accessibility of public accommodations. Cal. Health & Safety Code §§ 19956, 19959. From December 31, 1981, until the present, the standards have appeared in Title 24 of the California Code of Regulations. In addition to setting forth design and construction standards, the California standards require public accommodations to maintain in operable working condition those features of facilities and equipment that are required to be accessible to and usable by persons with disabilities. The California standards set forth a comprehensively detailed list of design specifications prescribing the minimum standards for all manner of architectural elements, which are similar but not identical to the requirements in the DOJ standards for the ADA.[2] A violation of a California standard violates both the CDPA and

---

[2] For example, the DOJ standards require that if a ramp run has a rise greater than six inches or a horizontal projection greater than 72 inches, then it must have handrails on both sides. The California standards, on the other hand, require handrails if a ramp's slope exceeds a five percent gradient, except at exterior door landings where it matches the DOJ standards. 28 C.F.R. pt. 36, App. A at 4.85; Cal. Code Regs.

1   the Unruh Act.  A violation of the ADA also constitutes a violation of both California statutes.

2   Cal. Civ. Code §§ 51(f), 54(c).  It may be possible, however, for an accessibility barrier to violate

3   the California statutes without violating the ADA.

4           **3.      PLAINTIFFS' CLAIMS.**

5           In the complaint, plaintiffs asserted that class certification was appropriate in this action

6   because the same discriminatory design features were imposed by Burger King Corporation on all

7   92 locations.  They alleged that some or all of the stores were built according to "one or a limited

8   number of architectural design prototypes developed by Burger King."  *They alleged that Burger*

9   *King entered into development agreements requiring construction of some or all of the California*

10  *restaurants in accordance with Burger King's latest designs, and that Burger King provided*

11  *building plans and specifications*.  They alleged that Burger King's construction teams aided in

12  designing and building some or all of the locations.  They averred that some or all of the

13  restaurants were contractually required to be and were *remodeled in conformance with Burger*

14  *King's construction and design plans and specifications* (Compl. ¶¶ 25-34).  On the basis of these

15  pleadings of common architecture, designs, construction, and policies, defendant's motion to

16  dismiss or strike the class claims was denied (Dkt. No. 69).

17          Put differently, the importance of a common set of blueprints calling for ADA violations

18  addresses the need for a common method of class-wide proof.  Otherwise, the trial must be

19  litigated feature-by-feature and store-by-store on myriad questions of violation (or not).

20  The Court's own experience in other ADA mobility cases has been that the feature-by-feature

21  analysis is highly site-specific and consumes considerable resources per site.  This would be

22  further complicated in the case at hand by the unique issues of when and to what extent a facility

23  was built or substantially renovated and what would or would not be "readily achievable," clearly

24  a site-by-site adjudication.

25          In their motion for class certification, plaintiffs have now retreated from their allegations

26  of common architecture, designs, construction, and policies.  As it turns out, contrary to the

27  original allegations, there has actually been considerable variation among the 92 locations.

28
_____
tit. 24, 11133B.5.5.1 (2001).

There was no common architectural design that caused the same barriers of access across the 92 locations (Boothby Supp. Exh. 1).  Quite possibly each of the 92 stores violates the ADA or California standards for accessible design in some way or another, but the deviations from the long list of modern disability design requirements will require a store-by-store, door-by-door, mirror-by-mirror adjudication.  Again, this is due to the absence of any common blueprint for the features subject to the ADA standards, or any other form of common proof.

To be sure, some issues would cut across all 92 locations, for example, the relationship of Burger King Corporation to the restaurant operators.  Burger King Corporation's relationship with the franchisees/lessees was governed primarily by two contracts — a franchise agreement and a lease agreement — as well as a development agreement for newly-constructed restaurants. Although not identical from store to store or year to year during the purported class period, the terms of the agreements generally reveal that Burger King Corporation reserved and exercised the power to approve plans and specifications for most aspects of the franchisees/lessees' operations, and Burger King Corporation carried out inspections of restaurants to enforce acceptable standards of repair, maintenance, and image (Campins Exh. 58–86).

Although Burger King Corporation required that new restaurants be constructed, equipped and furnished in accordance with approved plans and specifications, the franchisees/lessees were required to contract independently at their own expense for architectural and engineering services, to create their own blueprints and construction plans for each of their restaurants, and to ensure that they complied with applicable building codes and accessibility laws.

Burger King Corporation provided new restaurants with a set of standard plans and specifications which were described as "generic masters" that "require[d] confirmation and revisions to comply with all local governmental standards."  These referenced the features subject to the ADA standards only generally without delving into requisite dimensional measurements or specifics of compliance requirements, and required no particular feature that would constitute an ADA violation.  These types of details were left to the architects hired locally by each franchisee.  After each franchisee/lessee's architect made necessary modifications, as required by governmental bodies and the particular configuration of the property on which the new restaurant

was to be located, Burger King Corporation reserved the right to review the building type, site layout, signage, and overall adherence to current building standards and brand identity, and to require modifications (Campins Exh. 90–94, 96–98). In other words, Burger King Corporation insisted that the franchises build out their stores in compliance with disability laws and did not dictate the specifics.

The only thing that comes close to a common blueprint concerns "queue lines." These are the lines in which customers wait to order. Drawings of sample front counter areas in a 1984 equipment plan layout and a 1991 operations manual by Burger King Corporation stated that queue lines should be a minimum of 30-inches wide, which violated the California standards requiring queue lines to be a minimum of 36-inches wide.[3] The record shows, however, that many of the restaurants visited by plaintiffs used layouts which did *not* have queue lines at all. No other feature, such as door pressure, ramp placement, ramp angle, mirror placement, and so on was centralized (Campins Exh. 123, 124, 126; Blackseth Exh. 1).[4]

Eighty-eight of the 96 corporate-leased restaurants that existed during the class period were constructed before the ADA became effective as to newly-constructed buildings in January 1993, and eight predated the 1982 effective date of the California statutes. Corporate-leased Burger Kings were built in at least twelve general basic architectural styles, but none of these general styles has been shown to include any design details implicating features in violation of disability standards (Boothby Supp. Exh. 1). In other words, the extent to which there were violations or not at different restaurants even of the same general style would still need to be litigated store-by-store and feature-by-feature.

The franchise agreements required the restaurants to remodel at least once every twenty years. Each restaurant had a unique post-construction alteration history in terms of

---

[3] The ADA, which did not go into effect until after 1991, also requires a minimum width of 36 inches for wheelchair passage. 28 C.F.R. pt. 36, App. A. at 4.2.1.

[4] Plaintiffs do not identify any other policy, plan, or blueprint from Burger King Corporation that even arguably called for a feature that would violate the ADA or California standards, except to assert in passing that defendant's "speed of service standards," which set maximum times within which customers must be served, "exacerbate the access issues created by queue lines and condiment and drink dispensers." Plaintiffs do not, however, explain why this would be so.

structure, design, facilities, accommodations, and times of alteration.  Although Burger King Corporation retained the right to approve all alterations and punished franchises that remodeled without approval, it never provided sample plans for existing restaurants to use as mandates or guides when remodeling.  When alterations to existing restaurants were made, they were not based on any centralized construction plans developed by Burger King Corporation.  The lease agreements between Burger King Corporation and the franchisees/lessees put all responsibility for the condition of the premises, including the cost of any repairs or alterations, on the franchisees/lessees.  Again, the agreements expressly required that franchisees/lessees comply with applicable accessibility laws, including the ADA (Campins Exh. 98; McGory Decl., ¶¶ 2, 9–10).

The declarations of named plaintiffs and the 48 potential class members provide anecdotal allegations of six categories of accessibility problems at the corporate-leased California Burger King restaurants.  These include:  (1) barriers at entrances to restaurants, including doors that were difficult or impossible to open; (2) queue lines that were too narrow to traverse in a wheelchair or scooter; (3) drink and condiment dispensers that were difficult or impossible to reach; (4) dining rooms where the declarants could not access tables in their wheelchairs or scooters; (5) restrooms with doors that were difficult or impossible to open and with inadequate stalls; and (6) parking lots with access aisles that were too narrow, inadequate signage, not enough accessible spaces, and inaccessible routes to entrances (Compl. ¶ 44).

Plaintiffs do *not*, however, limit the scope of the action to their six general categories, nor could they since their expert has not yet inspected all 92 locations.  Experience has shown that after expert inspections are done, the list of arguable deviations from the ADA standards will be lengthy and will vary from location to location.  Each of plaintiffs' six general categories, moreover, subsumes multiple discrete issues.  For example, entrance barriers subsume ramp angles, door pressure, door width, path of travel from parking lot to ramp, and so on. The specifics of each will vary from store to store.

In their motion for class certification, as stated, plaintiffs have retreated from the allegations in the amended complaint that Burger King Corporation imposed common

architectural designs calling for access barriers across all 92 stores. Instead, they have fallen back to an argument that Burger King Corporation maintains substantial control over the leased restaurants through the development, franchise, and lease agreements, and that it has neglected to enforce centralized policies requiring the leased restaurants to comply with accessibility requirements. They aver that Burger King Corporation's failure to affirmatively prevent and remove barriers — a nondelegable duty under the ADA — allowed accessibility barriers to arise at some or all of the 92 leased restaurants across California.

To be sure, the legal responsibility of Burger King Corporation for any accessibility violations that exist is a common issue across all 92 stores. If this were the only issue, class certification would be straightforward. But that simple issue cannot even be reached without first deciding the bone-crushing feature-by-feature and store-by-store analyses required to establish whether and to what extent violations at each store exist in the first place.

**4.      CLASS CERTIFICATION.**

Although this order will certify ten separate classes of wheelchair patrons that correspond to the ten stores visited, it will not certify the broad class requested by plaintiffs. The three named plaintiffs aver that they personally experienced access barriers at ten different corporate-leased Burger King restaurants. Separate classes *will* be certified for each of the ten restaurants, as follows:

> All individuals with mobility-impairment disabilities who use wheelchairs or electric scooters for mobility who, at any time on or after April 16, 2006, and up to the date of the class notice, were denied, or are currently being denied, on the basis of their mobility-impairment disability, full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of [the particular restaurant applicable to that class].

Plaintiff Corbett will be appointed as class representative for the class of patrons who allegedly encountered barriers at the restaurant she averred that she visited, located at 6021 Central Avenue, in El Cerrito (Class 1). Plaintiffs Corbett and Castaneda will be appointed as joint class representatives for the class of patrons who allegedly encountered barriers at the restaurant they both averred that they visited, located at 4200 International Boulevard/East 14th Street in Oakland (Class 2). Plaintiffs Wellner and Castaneda will be appointed as joint class

9

representatives for the class of patrons who allegedly encountered barriers at the restaurant they both averred that they visited, located at 2415 North Texas Street, in Fairfield (Class 3). Plaintiff Castaneda will also be appointed as class representative for each separate class of patrons who allegedly encountered barriers at a restaurant that he averred that he visited, including the restaurants located at 677 Contra Costa Boulevard, in Pleasant Hill (Class 4); 2162 Railroad Avenue, in Pittsburg (Class 5); 2440 Mahogany Way, in Antioch (Class 6); 1799 North Broadway, in Walnut Creek (Class 7); 972 El Camino Real, in South San Francisco (Class 8); 950 West A Street, in Hayward (Class 9); and 2757 Castro Valley Boulevard, in Castro Valley (Class 10).

# ANALYSIS

**1.     DEFENDANT'S MOTION TO STRIKE DECLARATIONS AND EXCLUDE WITNESSES.**

Before turning to the main event, this order must first address a predicate matter. When making their initial disclosures, plaintiffs provided to Burger King Corporation potential class members' names, cities of residence, and a summary of the access barriers that they allegedly had encountered at specified Burger King-leased restaurants. Plaintiffs did not, however, initially provide these potential class members' contact information to defendant. Plaintiffs argued that because the potential class members had called plaintiffs' counsel for information and advice about their rights in the action, Burger King Corporation should not be permitted to contact them except in the presence of plaintiffs' counsel. Plaintiffs did not seek a protective order for the putative class members' contact information but, instead, attempted to resolve their dispute with defendant over the matter through informal discussions.

Eventually, Burger King Corporation filed a motion to compel the potential witnesses' contact information. After briefing and oral argument, Magistrate Judge James Larson held that, because case law is unambiguous that potential class members are unrepresented prior to class certification, plaintiffs' argument for withholding their contact information was unjustified and the information needed to be produced. Judge Larson also held that plaintiffs' counsel could not interfere with defense counsel's contacts with these potential plaintiffs but did grant in part plaintiff counsels' request for a protective order. He held that defense counsel must identify

1    themselves to the potential plaintiffs when contacting them and advise them that they need not

2    speak with defense counsel if they did not want to do so.

3         In accordance with Judge Larson's ruling, plaintiffs provided the required contact

4    information although by then the class certification discovery deadline had passed.  Burger King

5    Corporation did not seek to reopen discovery or continue the deadline for its opposition to class

6    certification, which was due by August 21, 2009, about two weeks after plaintiffs disclosed the

7    potential witnesses' contact information.

8         Burger King Corporation claims that plaintiffs' gamesmanship in turning over potential

9    class members' contact information prevented it from gathering important information in

10   opposing plaintiffs' motion for class certification.  Burger King Corporation seeks to (1) strike all

11   of the declarations that plaintiffs submitted in support of their motion for class certification, and

12   (2) preclude any potential class member who was not "properly disclosed" from testifying at

13   trial.[5]

14        Burger King Corporation notes that the case management order stated that all initial

15   disclosures under FRCP 26 had to be "completed by March 6, 2009, *on pain of preclusion under*

16   *FRCP 37(c)*" (emphasis added).  Rule 37(c)(1) states:

17        If a party fails to provide information or identify a witness as
          required by Rule 26(a) or 26 (e), the party is not allowed to use
18        that information or witness to supply evidence on a motion, at a
          hearing, or at a trial, *unless the failure was substantially justified*
19        *or is harmless* (emphasis added).

20        Burger King Corporation argues that plaintiffs' failure to turn over the potential class

21   members' addresses was neither justified nor harmless and that exclusion is the proper remedy.

22   It does not aver with specificity how it was prejudiced by the late disclosure, however, and its

23   citations are distinguishable.  Burger King relies primarily on *Torres v. City of Los Angeles*,

24   548 F.3d 1197 (9th Cir. 2008), where the Ninth Circuit upheld the exclusion under Rule 37(c)

25   of an expert witness at a police misconduct trial where his expert report had not been previously

26

27        [5]  Burger King Corporation also filed objections to all of these declarations on September 15, 2009.
     These objections should have been filed with its opposition to plaintiffs' motion for class certification rather
28   than two days before the hearing on the motion.  This order, at all events, does not depend on the portions of the
     declarations to which defendant objects, and so does not need to reach the objections.

disclosed. *Id.* at 1213. Burger King Corporation also relies on *Lee v. City of Novato*, No. C 03-02542 WHA, 2004 WL 1971089 (N.D. Cal. Sept. 7, 2004), which involved the exclusion of the plaintiff's expert witness's testimony where the plaintiff had failed to file the required expert report until the day the opposition expert report was due. This delay substantially harmed the defendant because it gave the plaintiff's expert the opportunity to review the opponent expert's report and respond to its arguments in his opening report. *Id.* at *6.

The potential harm from spring-loading an expert witness is worse than what happened here. Expert testimony involves scientific, technical, or specialized knowledge, and its late disclosure offers a greater possibility of harm to opposing parties than late disclosure of fact-witness testimony. Additionally, plaintiffs here were not late in disclosing the substance of the potential class witnesses' declarations, only their contact information. This is therefore less egregious than withholding an expert report which contains the substance of an expert's intended testimony. Unlike *Torres*, where the expert report was withheld until trial, and *Lee*, where the expert report was withheld until the same day that the opponent's report was due, here plaintiffs still turned over the report weeks before Burger King Corporation's opposition was due. To be sure, the Court is disappointed that plaintiffs' counsel stiffed defendant in their disclosure obligations. Nonetheless, there has not been substantial harm to our defendant here. Striking the declarations of plaintiffs' witnesses and precluding plaintiffs from relying on these witnesses in their class certification motion would be far too harsh.

## 2. WHY A RULE 23(b)(2) CLASS WILL NOT BE CERTIFIED AS TO ALL 92 STORES.

Turning to the merits of whether class certification is appropriate, "the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather, whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–78 (1974). Although a district judge may not investigate the likelihood of prevailing on the merits, he or she is at liberty to consider evidence relating to the merits if such evidence also goes to the requirements of Rule 23. The party seeking class certification bears the burden of showing that each of the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b) are met. *See Hanon v. Data Prods. Corp.*, 976 F.2d 497, 508–09 (9th Cir. 1992).

For a named plaintiff to obtain class certification, the district court must find: (1) numerosity of the class; (2) common questions of law or fact predominate; (3) the named plaintiff's claims and defenses are typical; and (4) the named plaintiff can adequately protect the interests of the class. Additionally, plaintiffs here seek class certification under Rule 23(b)(2). Certification under Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole . . . ."

There are several major obstacles to a 92-store class. *First*, there is a lack of commonality under Rule 23(a)(2). Because each location has unique facilities, there is neither a common core of salient facts regarding what accessibility barriers each restaurant's patrons face nor a shared predicate legal issue of whether each restaurant's facilities violates the ADA or California statutes.

*Second*, final injunctive relief under Rule 23(b)(2) is not appropriate for a 92-store class as a whole; it is only appropriate as to those stores where there are in fact statutory violations. With no common blueprint but with considerable variation among the architecture of all the locations, it appears highly unlikely that all 92 stores will be found to be in violation. This issue must be addressed *before* addressing any common issues such as Burger King Corporation's responsibility as a lessor, and turns on a highly individualized and extremely detailed mirror-by-mirror, door-by-door, ramp-by-ramp, detail-by-detail examination of each store. The issue also depends on when each store was built and/or renovated, which determines what ADA and California standards apply to that location, if any.

*Third*, Rule 23(b)(2) classes usually only seek injunctive or declaratory relief. Because the large statutory damages sought under the California statutes here predominate over the injunctive relief sought, Rule 23(b)(3) analysis is more appropriate instead.

*Finally*, because every store may well be different under this examination, the claims of the named plaintiffs are not typical under Rule 23(a)(3) of a 92-store class as a whole. A plaintiff's claim would, however, be typical as to the same store where that plaintiff encountered a barrier.

These four points are now considered in detail.

**A.      Lack Of Commonality.**

A class has sufficient commonality under Rule 23(a)(2) if "there are questions of law or fact which are common to the class."  Rule 23(a)(2) does not require each member in a class to have identical factual and legal issues surrounding his or her claim, but it does require either a shared legal issue or a common core of salient facts. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998).

Plaintiffs have failed to meet their burden under Rule 23(a)(2) because they have not shown either a common core of salient facts — that Burger King Corporation created common barriers to access across multiple restaurant locations — or a shared legal issue — whether there were violations of the ADA or California statutes at each location.  As already noted, any shared legal issues, such as Burger King's legal responsibility for violations as a franchisor/lessor, are predicated on an initial determination of the entirely individual issues of whether there is liability at each store in the first place.  The lack of commonality with regards to access barriers across multiple facilities weighs heavily against class certification especially where, as here, there is no affirmative centralized plan calling for the alleged barriers at different stores.

Before any common legal issues can be reached, each feature at issue in every store must be individually measured, and then a determination must be made as to whether that issue meets the DOJ and California standards.  For example, under the DOJ regulations, the maximum force that may be required to open a hinged bathroom door is five pounds-force.  28 CFR pt. 36, App. A at 4.13.11.  If bathroom mirrors are to be used by both ambulatory people and wheelchair users, then they must be at least 74-inches high at their topmost edge. *Id.* at A4.19.6.  Every sink is required to be mounted with the counter or rim no higher than 34-inches, be a maximum of six-and-a-half inches deep, have knee clearance that is at least 27-inches high, 30-inches wide, and 19 inches deep, have pipes that are insulated or configured so as to protect against contact, have a clear floor space at least 30-inches by 48-inches in front of the sink, and have faucets with one of four acceptable designs. *Id.* at 4.24.  Depending on the configuration of each location, potentially hundreds of measurements such as these will need to be made at each of the

1    92 restaurants, and then evaluated under both the DOJ and California standards before any

2    legal issue common across different stores is reached.

3         In ADA cases, the retained experts of both parties inspect the premises at issue and

4    prepare lists of arguable violations they encounter.  Experience has shown that they will disagree

5    on many items.  They do not always agree even on the results of their measurements for particular

6    fixtures and an adjudication must then be made to determine the proper method for measurement.

7    When the cases are litigated, the disputes must be examined one-by-one and site-by-site to sort

8    out which expert is closest to the truth.

9         In support of a 92-store class action, plaintiffs invoke *Moeller v. Taco Bell Corp*,

10   220 F.R.D. 604, 605 (N.D. Cal. 2004).  *Moeller* held that certification of an injunctive class

11   action was appropriate.  It also involved mobility-impaired patrons bringing suit under the ADA,

12   the Unruh Act, and the CDPA alleging that a chain of fast-food restaurants had barriers to access.

13   In *Moeller*, however, Taco Bell conceded that all of the stores were built in accordance with

14   centrally designed blueprints that resulted in common accessibility violations at all of the stores.

15   All newly constructed Taco Bell restaurants in *Moeller* were built in accordance with prototypes

16   designed by Taco Bell's architecture and engineering department located at Taco Bell's corporate

17   headquarters and all large-scale retrofit projects were based on designs prepared by the same

18   department.  Furthermore, all of the stores were owned and operated by Taco Bell, which

19   admitted that it controlled all aspects of its own corporate restaurants including accessibility.  *Id.*

20   at 609–10.  As a result of Taco Bell's common blueprint calling for designs in violation of ADA

21   standards, it was possible in *Moeller* to show both a common locus of facts and to use a common

22   method of proof of the existence of the same violations across all stores.

23        Here, by contrast, plaintiffs have sued defendant with respect to restaurants that defendant

24   leased to third-party operators who were required to obtain their *own* blueprints and construction

25   plans and to contract independently for architectural and engineering services.  Although Burger

26   King Corporation provided new restaurants with a general set of standard plans and

27   specifications, these lacked the detail of blueprints and did not insist on features violating the

28   accessibility statutes.

Significantly, plaintiffs have failed to make the case that Burger King Corporation has any common offending policies or design characteristics that called for common accessibility barriers at different restaurants. As stated, the closest plaintiffs can come to show any kind of accessibility barriers called for by common centralized policies are the two illustrations from 1984 and 1991 showing a minimum width for queue lines of 30 inches, instead of 36 inches as mandated by California law at the time.[6] Of the six categories of accessibility problems alleged by plaintiffs, only one has any common method of proof — that queue lines were too narrow — and even that method would have to rely on faded evidence from a quarter-century ago that would have been superseded in many instances by the remodeling that was called for every twenty years, itself another fact question differing among the 92 locations.

Plaintiffs also rely on *Arnold v. United Artists Theatre Circuit, Inc.*, 158 F.R.D. 429 (N.D. Cal. 1994), which certified a class where the challenged "design features" were alleged to exist at "many if not all of defendant's theatres" and "the legality of those features are legal issues common" to the class. *Id.* at 449. By contrast, it is clear here that the franchisees/lessees made individualized decisions relating to 96 different restaurants across California over many years, and that their restaurants were built and remodeled at different times and in different architectural styles such that the same standards under the ADA, Unruh Act, and CDPA do not apply to them all. Unlike the decisions on which plaintiffs rely, proving the existence and cause of accessibility barriers at each of the corporate-leased Burger King restaurants in California would be too fact-intensive and individualized to be effectively addressed in a single class action.

Plaintiffs argue that even if defendant does not have any affirmative central policies which called for access barriers at all 92 stores, it would be sufficient if such barriers arose from defendant's failure of oversight to ensure the individual restaurants' compliance with accessibility

---

[6] The Court realizes that it denied plaintiffs' motion to continue the class certification hearing because of the pendency in front of Magistrate Judge Larson of their motion to compel additional discovery from defendant related to recent surveys and retrofits at the restaurants at issue in this action. To the extent that this discovery would have marginally buttressed plaintiffs' argument, they should have diligently pursued their motion in sufficient time to support their class certification motion. Instead, they delayed bringing their motion to compel until its motion practice could not be completed in time, and failed to show substantial justification for their delay.

laws. Plaintiffs have submitted evidence of defendant's failure to enforce compliance with accessibility standards — a failure of oversight.

This does not come to grips with the real problem, namely, proving that each of the 92 stores were (and are) in violation of the disability laws in the first place. To get to the bottom of this threshold question, it would be necessary to have 92 trials within a trial. Each location would vary. One might have a door pressure violation, another a mirror-placement fault, another a ramp angle correction, another a path-of-travel violation — or perhaps all of these violations would occur at some other locations. Possibly some stores would be found to have no violations at all. It is hard to litigate even one location, there being so many specific features that must be examined and evaluated. Litigating 92 in one case would be impossible without a common method of proof.

Therefore, it is no answer that Burger King Corporation may have nondelegable liability as a lessor. That is the easy part of the case. The hard part, which cannot be escaped, is the extent to which the ADA and state laws were violated in the first place, if at all.

### B. Inappropriateness of Injunctive Relief to Class as a Whole.

Certification under Rule 23(b)(2) is appropriate where the party against whom relief is sought has acted or refused to act on grounds generally applicable to a class of persons, thereby making appropriate declaratory or injunctive relief with respect to the class as a whole. *American Council of the Blind*, 2008 WL 4279674 at *4 (N.D. Cal. 2008) (Judge Alsup). Class certification under Rule 23(b)(2) requires that the primary relief sought be declaratory or injunctive. The rule does not focus on the viability or bases of class members' claims for declaratory or injunctive relief but only looks at whether class members seek uniform relief from a practice generally applicable to the class as a whole. *Rodriguez v. Hayes*, No. 08-56156, 2009 WL 2526622, at *13 (9th Cir. August 20, 2009).

As noted above, final common injunctive relief would only be appropriate as to those stores where there are in fact accessibility violations, and the relief would even then vary from location to location. The issue of the extent of any violations at each particular store must

1    be addressed before any relief may be fashioned.  That turns on a highly individualized and

2    bone-crunching analysis of hundreds of details at each store.

3         Even after this determination, the actual injunctive relief ordered must be individually

4    fashioned for each location.  At one location, a bathroom mirror may need to be lowered.

5    At another location, an automatic door may need to be adjusted to close more slowly.

6    Another location might need to add more dining tables accessible to patrons in wheelchairs,

7    and widen the access aisles next to designated accessible parking spaces to allow persons in

8    wheelchairs to unload from their vehicles.  Because every store will have different violations,

9    any ordered injunctive relief will primarily need to be tailored store-by-store.  There can be no

10   "generally applicable" relief in this case as to patrons of *all* 92 stores.

11        A special master idea was proposed by plaintiffs' counsel at the hearing as the solution to

12   these problems.  A special master, they say, could conduct site inspections of all of the leased

13   restaurants and submit recommendations for bringing any access barriers into compliance with

14   the ADA and California statutes.  In *Moeller v. Taco Bell Corp.*, such a procedure was ultimately

15   stipulated to by the parties and then ordered by the court after class certification was approved.

16   *Moeller*, 220 F.R.D. at 605.

17        Rule 53(a), which governs the appointment of special masters, states in pertinent part that

18   unless a statute provides otherwise, a court may appoint a master only to perform duties

19   consented to by the parties, or to hold trial proceedings and make or recommend findings of fact

20   on issues to be decided without a jury if appointment is warranted by "some exceptional

21   condition."  At the hearing, defendant Burger King Corporation stated that it would *not* consent to

22   the appointment of a special master.  The appointment of a special master to aid in the factual

23   determination of what injunctive relief is required at each of the 92 stores could only be pursuant

24   to "some exceptional condition."

25        Reference to a master "shall be the exception and not the rule."  *Burlington Northern v.*

26   *Department of Revenue*, 934 F.2d 1064, 1071 (9th Cir. 1991).  "The use of masters is to aid

27   judges in the performance of specific judicial duties, as they may arise in the progress of a cause,

28   and not to displace the court."  *La Buy v. Howes Leather Co.*, 352 U.S. 249, 256 (1957).

"Litigants are entitled to a trial by the court, in every suit, save where exceptional circumstances are shown." *Id.* at 258. "The Courts have tended to read Rule 53 narrowly, closely circumscribing the range of circumstances in which reference to a master is appropriate." *Burlington Northern*, 934 F.2d at 1071. The Supreme Court has held that the unusual complexity of an action, the length of time a trial would require, and congestion of a court's calendar were *not* exceptional conditions which would warrant a reference to a master under Rule 53(b). *La Buy v Howes Leather Co.* 352 US 249, 258–59 (1957).

Courts sometimes find "exceptional conditions" and appoint special masters to determine individualized issues of damages after class liability has already been established. *See, e.g., Hilao v. Estate of Marcos,* 103 F.3d 767, 782 (9th Cir. 1996) (special master appointed to supervise taking of depositions of randomly selected class members to determine distribution of compensatory damages award); *Cordoza v. Pacific States Steel Corp.,* 320 F.3d 989, 995 (9th Cir. 2003) (master appointed to oversee funding of medical plan in ERISA case). In *Burlington Northern*, however, the Ninth Circuit reversed a district court's finding of exceptional condition where an entire action was referred to a master. The district court in *Burlington Northern* had required the master to prepare and complete a draft report setting forth findings of fact and conclusions of law. The district court after a hearing could adopt, modify, or reject the report, receive further evidence, resubmit the report with instructions to the master, or "make the final determination as to the matters herein at issue." The Ninth Circuit held that the "wholesale reference" of an action to a special master was an "inexcusable abdication of judicial responsibility and a violation of article III of the Constitution." *Burlington Northern*, 934 F.2d at 1072.

The appointment of a special master to determine not merely damages but liability, including the extent to which each of the 92 individual restaurants is in violation of accessibility requirements, would be an abdication of judicial responsibility. It would be an impermissible delegation of the Court's duty to determine both issues of defendant's liability and the extent of injunctive relief, not to mention statutory damages to class members, a separate concern. Appointing a special master would not solve the real problem — namely, that there is no

affirmative common corporate policy calling for access barriers at all 92 stores. Even a special master would have to adjudicate all of the myriad issues. All would then be subject to relitigation before the district judge under Rule 53(f).

Nor is it an answer that the case might settle, mooting out many of the complexities, with a framework to bring all stores into compliance. The certification criteria must be applied on the assumption that the case will be litigated, not that it will be settled.

### C.    Damages Claims Predominate.

The next problem with a 92-store class concerns the damage claims, namely the statutory damages per violation. As already noted, Rule 23(b)(2) usually involves only injunctive and declaratory relief, not damages. The Ninth Circuit has held that Rule 23(b)(2) class treatment is appropriate if the value to plaintiffs of the injunctive relief sought predominates over any compensatory or punitive damages sought. *Molski v. Gleich*, 318 F.3d 937, 950–51 (9th Cir. 2003). In *Molski*, the Ninth Circuit held that there is no bright-line rule for determining predominance. Rather, courts should look at the facts and circumstances of each action in an effort to determine the plaintiffs' intent in bringing the suit. *Id.* at 951.

Here, plaintiffs are seeking injunctive relief as well as the statutory minimum damages under the Unruh Act and the CDPA. Burger King Corporation argues that plaintiffs' damages claims predominate because their claims for injunctive relief under the ADA and California law are moot. Burger King Corporation argues that this is because the ten leased restaurants visited by the named plaintiffs are currently in compliance with the ADA and California Code.

Burger King Corporation, however, relies solely on the self-serving declaration of its expert witness, who avers that all ten restaurants were fully in compliance as of August 2009. It points to *Hubbard v. 7-Eleven, Inc.*, 433 F. Supp. 2d 1134 (S.D. Cal. 2006), where defendant 7-Eleven's motion for summary judgment was granted in an ADA suit because the architectural barrier alleged by the plaintiff had been remedied, rendering the issue of injunctive relief moot. *Id.* at 1145.

The present action is not at the summary judgment stage, however, but at the class certification stage under Rule 23. A district court must conduct a rigorous analysis of the moving

party's claims to examine whether the requirements of Rule 23 are met but should only consider evidence that relates to the merits if such evidence also goes to the requirements of Rule 23. *Hanon*, 976 F.2d at 509. A court should not consider whether the party seeking class certification is likely to prevail on the merits. *Eisen v. Carlisle & Jacqueline*, 417 U.S. 156, 178 (1974). At this point, there is a factual dispute between the parties over whether barriers to access exist at the corporate-leased restaurants in question. It would be improper at the class certification stage to determine this issue on the merits.

Even though plaintiffs' claims for injunctive relief are not moot, the large value of the monetary damages sought in this case relative to the value of any injunctive relief is most troubling as to whether we could proceed under Rule 23(b)(2) (not to mention dispensing with notice to absent class members). The "minimum statutory" damages per offense under the California statutes are $4000 per offense under the Unruh Act, and $1000 per offense under the CDPA. A separate violation may occur every time a person visits a restaurant and encounters an accessibility barrier or is deterred from going to a restaurant due to the existence of an access barrier there — or at least so plaintiffs can be expected to argue. Some of the potential class members say they have visited the restaurants at issue on a weekly basis or more over the class period, resulting in many dozens of violations and potentially entitling them to hundreds of thousands or even millions of dollars in "minimum statutory" damages each (Suttles Decl. ¶ 3; Hodge Decl. ¶ 3; Donley Decl. ¶ 3). As stated, the complaint seeks in excess of five million dollars (Compl. ¶ 6).

The value of such substantial damages likely predominates over the value of the injunctive relief sought and will require an individual-by-individual determination as to who visited which stores and how many times. For that reason, class certification is more appropriately analyzed under Rule 23(b)(3) instead of Rule 23(b)(2). Under Rule 23(b)(3), questions of law or fact common to the class must *predominate* over questions affecting the individual class members, and on balance a class action must be superior to other methods available for adjudicating the controversy. It seems clear that any common issues across all 92 stores would not predominate

over the issues that would be unique to each location, for all of the feature-by-feature reasons explained above.

Furthermore, the Ninth Circuit has held that "[b]y its terms, Rule 23 makes manageability an issue important only in determining the propriety of certifying an action as a (b)(3), not a (b)(2), class action." *Elliott v. Weinberger*, 564 F.2d 1219, 1229 (9th Cir. 1977), *aff'd in pertinent part and rev'd in part sub nom., Califano v. Yamasaki*, 442 U.S. 682 (1979). Under Rule 23(b)(3), a consideration of the enormous likely difficulties that would accompany managing a single class of all 92 stores would weigh heavily against certification.

### D.     Lack Of Typicality.

The typicality requirement of Rule 23(a)(3) is satisfied when "the claims or defenses of the representative parties are typical of the claims or defenses of the class." A plaintiff's claims are typical if they are "reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020. "In a public accommodations suit . . . where disabled persons challenge the legal permissibility of architectural design features, the interest, injuries, and claims of the class members are, in truth, identical such that any class member could satisfy the typicality requirement for class representation." *Arnold*, 158 F.R.D. at 450.

Because as explained at length above, the individual restaurants did not share common architecture, plans, remodels, policies, or barriers to access, named plaintiffs here have suffered different injuries than those suffered by purported class members who encountered different access barriers at other corporate-leased Burger Kings that the named plaintiffs did not visit. Their state-wide claims therefore do not satisfy the typicality requirement of Rule 23(a)(3).

### 3.     WHY TEN SEPARATE RULE 23(B)(3) CLASSES WILL BE CERTIFIED AS TO THE TEN STORES VISITED BY THE NAMED PLAINTIFFS.

On the other hand, every store visited by a named plaintiff is deserving of its own stand-alone class under Rule 23(b)(3). Rule 23(b)(3) certification is more appropriate here than Rule 23(b)(2) certification because the value of the potentially large damages claims predominate over the value of injunctive relief sought for each restaurant-wide class for the same reasons explained above with regards to a potential 92-store class. *Molski*, 318 F.3d at 949.

### A.    Commonality and Predominance.

Burger King Corporation does not dispute that plaintiffs have established Rule 23(a)(2) commonality for each separate class of patrons of the individual restaurants visited by the named plaintiffs because every patron of a particular restaurant faces identically alleged access barriers. The analysis under Rule 23(b)(3) "presumes that the existence of common issues of fact or law have been established pursuant to Rule 23(a)(2)." In contrast to the less stringent standard of Rule 23(a)(2), class certification under Rule 23(b)(3) is proper when common questions present a significant portion of the case and can be resolved for all members of the class in a single adjudication. *Hanlon*, 150 F.3d at 1019–22. All mobility-impaired patrons of a particular restaurant who use wheelchairs face identical facilities and identical access barriers. Their common interest in assuring that all the features at the particular restaurant are in compliance will predominate over any individual differences among them. Addressing any barriers at each store with injunctive relief lends itself to a single adjudication.

### B.    Typicality.

The named plaintiffs here, like members of each proposed class they represent, all use wheelchairs or scooters for mobility and by definition have encountered the same allegedly discriminatory barriers at the same particular store. Burger King Corporation does not dispute the typicality of the named plaintiffs as to classes of patrons of the restaurants that the named plaintiffs have visited. Therefore, their claims satisfy the typicality requirement of Rule 23(a)(3).

### C.    Numerosity.

Plaintiffs have presented census figures demonstrating that there are more than 150,000 people in California who use wheelchairs and scooters, as well as declarations from 48 putative class members who allege encountering access barriers at corporate-leased Burger Kings in California. They also have presented evidence that Burger King is a popular fast food restaurant and argue that the "common sense conclusion" is that its corporate-leased restaurants have many mobility-disabled patrons.

Burger King Corporation argues that census data are insufficient to establish numerosity by itself, relying on *Celano v. Marriott International, Inc.*, 242 F.R.D. 544, 549 (N.D. Cal. 2007).

*Celano* held that census data *alone* was "too ambiguous and speculative to establish numerosity" with respect to a purported class of mobility-impaired individuals who did not currently play golf but would like to do so at Marriott golf courses. Plaintiffs here by contrast rely on a combination of census data, declarations from numerous potential class members, and evidence of Burger King's popularity. For these reasons, this order finds that plaintiffs have satisfied their burden required by Rule 23(a)(1).

### D. Adequacy of Representation.

Rule 23(a)(4) requires that the representative parties will fairly and adequately protect the interests of the class. Determining whether the representative parties adequately represent a class involves two inquiries: (1) does the named plaintiff and counsel have any conflicts of interest with other class members, and (2) will the named plaintiff and his or her counsel act vigorously on behalf of the class? *See Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 512 (9th Cir. 1978). The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent. "[A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977).

Burger King Corporation does not contest the named plaintiffs' adequacy to represent store-wide classes limited to the stores which each of named plaintiff actually visited. Burger King Corporation does challenge proposed class counsel on the grounds that five separate law firms seek joint appointment as lead counsel. The Advisory Committee Notes to the Federal Rules of Civil Procedure caution that "the court should be alert to the need for adequate staffing of the case, but also to the risk of overstaffing or an ungainly counsel structure." Advisory Committee Note to Rule 23(g)(2) (2003 amendments).

As stated in prior cases, from over 35-years of practice and presiding, the undersigned is convinced that it is best to have only one law firm as class counsel. This will greatly reduce the inevitable duplication of effort that flows from two or more firms. The commentaries recognize this as well. *See, e.g., Third Circuit Task Force on the Selection of Class Counsel Final Report*, at 96 (2002) (noting that multiple counsel carry the danger of duplication of fees, and courts

24

should scrutinize staffing arrangements and intervene by removing class counsel if in the best interests of the class). Only when there is a special need for another firm should extra counsel be added. *In re: Merck & Co., Inc. Securities Litigation*, 432 F.3d 261, 267 n.4 (3rd. Cir. 2005) ("If plaintiffs believe that more than one law firm is necessary, they must demonstrate to the Court's satisfaction the need for multiple lead counsel").

By OCTOBER 9, 2009, AT NOON, plaintiffs shall submit a memorandum and declaration, under seal and *ex parte* if need be, explaining why anyone other than Bill Lann Lee and his firm Lewis, Feinberg, Lee, Renaker & Jackson, P.C., should be appointed as class counsel.

With respect to any potential attorney's fees application, please be aware of the following guidelines. One or possibly two lawyers are all that are usually needed at a hearing, depending on the difficulty and importance of the issue. One or possibly two lawyers plus one legal assistant are usually all that are needed in taking a deposition, fewer in defending, again depending on the difficulty of the witness or subject. Two lawyers, a legal assistant and an IT assistant are all that is needed at trial. If, however, the other side uses more than those benchmarks, then plaintiffs may usually do likewise. Current time records must be kept so that the lodestar can be tabulated by project, timekeeper, hourly rate, and time spent. The overall number of timekeepers should be kept to a small, efficient core group of lawyers and legal assistants, all of whom are up to speed, with only rare instances of bringing in extra timekeepers, such as, for example, to staff an emergency motion. Using summer associates and externs is almost always inefficient so, if they are used, their time should be reduced in accordance with professional billing judgment. Again, however, if the other side objects, we will examine the other side's staffing structure and usually allow plaintiffs the same latitude employed by the opposition.

### E. Plaintiffs' State Law Claims.

Burger King Corporation argues that plaintiffs' state law claims under the Unruh Act and the CDPA should be stricken from the class definition due to failure to state a valid claim. Burger King Corporation argues that the Unruh Act and the CDPA, by their terms, limit liability to those who actively make or incite discrimination in contrast to the ADA which imposes strict liability upon lessors of public accommodations.

Burger King Corporation's interpretation of the California statutes is incorrect. A violation of the ADA also constitutes a violation of both the Unruh Act and the CDPA. Cal. Civ. Code §§ 51(f), 54(c). The California Supreme Court has explicitly held that a plaintiff seeking damages for ADA violations under the Unruh Act is *not* required to prove intentional discrimination. Because the Unruh Act adopted the full expanse of the ADA, the California Supreme Court held that *all* ADA violations — whether or not involving intentional discrimination — were violations of the Unruh Act as well. *Munson v. Del Taco, Inc.*, 46 Cal. 4th 661, 672 (2009).

### 4. WHY ADDITIONAL PARTIES WILL BE ALLOWED THROUGH PERMISSIVE JOINDER ON CONDITION THAT THEY ABIDE BY THE EXISTING SCHEDULE.

Burger King Corporation moves to add as additional defendants the franchisees/lessees who operate the restaurants at issue in this litigation. It argues that the franchisees are "necessary" parties under Rules 19(a) or, in the alternative, that the Court should use its discretion to add the additional defendants "on such terms as are just" under Rule 21. District courts have considerable discretion under Rule 21 in determining whether additional parties should be included in a pending action. *Sams v. Beech Aircraft Corp.*, 625 F.2d 273, 277 (9th Cir. 1980).

Burger King Corporation's motion to add the franchisees/lessees is late. The case management order in this litigation previously set a deadline of March 6, 2009, to seek leave to add new parties. Burger King Corporation should have moved to bring these defendants into the action months ago. Nevertheless, this order will grant permissive joinder under Rule 20 of those franchisees/lessees who operate the ten restaurants for which classes will be certified on the conditions that old and new defendants do not seek to reopen discovery and live with the existing schedule and so long as new defendants are added and appear prior to dissemination of class notice.

Rule 20 provides: "Persons . . . may be joined in one action as defendants if: (a) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (b) any

question of law or fact common to all defendants will arise in the matter." Here, the franchisees/lessees operate and maintain the facilities in question and, under the terms of their lease agreements with Burger King Corporation, must indemnify Burger King Corporation for any accessibility violations that occur. Plaintiffs do not dispute that the franchisees/lessees are jointly and severally liable with Burger King Corporation for any violations, or that the claims against them do not arise out of the same transactions and occurrences. The joinder of the franchisees/lessees, furthermore, will be useful in efficiently effecting any necessary injunctive relief at the stores under their control. Burger King Corporation's motion will be denied as to the franchisees/lessees who operate and maintain the other 82 stores for which plaintiffs sought class certification. Because those stores are not included in any certified class, the addition of their franchisees/lessees is unnecessary.

**5.     How Case Management for the Ten Separate Classes will Proceed.**

For the reasons stated above, the Court hereby certifies separate classes under Rule 23(b)(3) for each of the ten stores where named plaintiffs allegedly encountered access barriers. The large amount of the "minimum statutory" damage claims and their value to absent class members require that counsel give careful consideration as to how notice should be disseminated so that absent class members will have the maximum opportunity to recover their damages. Because of the possible risk of cutting off legitimate claims, consideration will need to be given whether to implement a procedure whereby such damage claims should be extinguished only for claimants who affirmatively opt-in to the class.

The trial already set for **April 19, 2010, at 7:30 a.m.**, shall be devoted solely to Class Number 1 and the store located at 6021 Central Avenue, in El Cerrito.

A second trial is hereby set for **May 3, 2010 at 7:30 a.m.**, and shall be devoted only to Class Number 2 and the store located at 4200 International Boulevard/East 14th Street in Oakland.

A third trial is hereby set for **June 7, 2010, at 7:30 a.m.**, and shall be devoted only to Class Number 3 and the store located at 2415 North Texas Street, in Fairfield.

A fourth trial is hereby set for **JULY 6, 2010, AT 7:30 A.M.**, and shall be devoted only to Class Number 4 and the store located at 677 Contra Costa Boulevard, in Pleasant Hill.

A fifth trial is hereby set for **AUGUST 2, 2010, AT 7:30 A.M.**, and shall be devoted only to Class Number 5 and the store located at 2162 Railroad Avenue, in Pittsburg.

A sixth trial is hereby set for **SEPTEMBER 7, 2010, AT 7:30 A.M.**, and shall be devoted only to Class Number 6 and the store located at 2440 Mahogany Way, in Antioch.

A seventh trial is hereby set for **OCTOBER 4, 2010, AT 7:30 A.M.**, and shall be devoted only to Class Number 7 and the store located at 1799 North Broadway, in Walnut Creek.

An eighth trial is hereby set for **NOVEMBER 1, 2010, AT 7:30 A.M.**, and shall be devoted only to Class Number 8 and the store located at 972 El Camino Real, in South San Francisco.

A ninth trial is hereby set for **DECEMBER 6, 2010, AT 7:30 A.M.**, and shall be devoted only to Class Number 9 and the store located at 950 West A Street, in Hayward.

A tenth trial is hereby set for **JANUARY 3, 2011**, at 7:30 a.m., and shall be devoted only to Class Number 10 and the store located at 2757 Castro Valley Boulevard, in Castro Valley.

A final pretrial conference is hereby set at **2:00 P.M.** for the **MONDAY ONE WEEK BEFORE EACH TRIAL DATE**, said conference to be limited solely to the store pertaining to that trial.

In prior ADA cases, the Court has observed that counsel, even in class cases, sometimes try to gamble on postponing as long as they can the expense of inspections and expert reports and if and when there is no settlement seeking extensions. All expert reports on all stores in question are due on **DECEMBER 31, 2009**, as per the case management order (Dkt. No. 68). Please make sure the experts personally visit and inspect each store in question, and take photographs to help resolve the inevitable fact disputes that will arise between the experts. Please do not try to cut corners and merely critique the other side's expert or rely on the other side's "survey" evidence (though such evidence may well be received). Extensions will *not* be granted to do expert reports that should have been done under the generous case schedule set earlier in the case.

## CONCLUSION

For the reasons stated above, the ten classes identified above are hereby **GRANTED** and Bill Lann Lee and his firm Lewis, Feinberg, Lee, Renaker & Jackson, P.C., are appointed as class

counsel.  The motion to certify is otherwise **DENIED**.  On or before **OCTOBER 15, 2009 AT NOON**, the parties are requested to jointly submit proposed forms of notice that will advise class members of each of the ten certified classes, among other things, of the damages sought, of their rights to intervene in this action, opt out, submit comments, and contact class counsel, as well as a plan for notice dissemination.  Defendant's motion to add franchisees/lessees is **GRANTED IN PART** as to the franchisees/lessees which own the ten restaurants for which classes are being certified on the conditions that defendants abide by the existing schedule and so long as new defendants are added and appear prior to dissemination of class notice.  The motion to add additional defendants is otherwise **DENIED**.  Defendant's predicate motion to strike declarations and exclude witnesses is **DENIED**.

**IT IS SO ORDERED.**

Dated:  September 25, 2009.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE